UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>SIMON GRINSHTEYN,<br><br>Defendant | Criminal No. 26cr10019<br><br>Violation:<br><br>Count One: False Statement Relating to Health Care Matters<br>(18 U.S.C. § 1035)<br><br>Forfeiture Allegation:<br>(18 U.S.C. § 982(a)(7)) |

INFORMATION

At all times relevant to this Information:

General Allegations

1. Defendant SIMON GRINSHTEYN ("GRINSHTEYN"), a 51-year-old resident of Lee County, Florida, was a doctor licensed to practice medicine in Florida.

2. Conclave Media LLC ("Conclave") was a Delaware limited liability company doing business in the District of Massachusetts. Conclave purported to offer telemedicine services.

*The Medicare Program*

3. The Medicare Program ("Medicare") was a federally funded health insurance program affecting commerce that provided health care benefits to persons who were 65 years of age and older or disabled. The benefits available under Medicare were governed by federal statutes and regulations.

4.      Medicare was a "health care benefit program" within the meaning of Title 18, United States Code, Section 24(b) and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

5.      The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services, oversaw and administered Medicare.

6.      Individuals who qualified for Medicare benefits were commonly referred to as "beneficiaries." Each beneficiary was given a unique Medicare identification number.

7.      Medicare covered, among other things, medical services provided by physicians, medical clinics, laboratories, and other qualified health care providers—including the ordering of durable medical equipment ("DME"), prosthetics, orthotics, and supplies, and diagnostic testing—that were medically necessary and ordered by licensed medical doctors or other qualified health care providers.

8.      Health care providers that provided services to Medicare beneficiaries, including DME suppliers and laboratories, were able to apply for and obtain a "provider number." A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

9.      To receive Medicare reimbursement, providers had to apply for and execute a written provider agreement, known as CMS Form 855I. The provider was required to sign and date the application, and the application contained certifications—under penalty of perjury— that the provider, among other things, agreed to abide by the Medicare laws and regulations, including the Anti-Kickback Statute, and that the provider "will not knowingly present or cause to be

presented a false or fraudulent claim for payment by Medicare and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

10. Medicare-enrolled providers were required to submit claims for services provided to Medicare beneficiaries. 42 U.S.C. § 1395w–4(g)(4).

11. Medicare claims were required to be properly documented in accordance with Medicare rules and regulations.

12. Medicare paid for claims only if the items or services were medically reasonable, medically necessary for the treatment or diagnosis of the beneficiary's illness or injury, accurately documented, and actually provided as represented to Medicare. Medicare would not pay for items or services that were procured through kickbacks and/or bribes.

*Durable Medical Equipment*

13. DME was reusable medical equipment such as orthotic devices, walkers, canes, and hospital beds. Orthotic devices were a type of DME that included knee braces, back braces, shoulder braces, and wrist braces.

14. Medicare reimbursed DME providers for medically necessary items and services provided to beneficiaries. In claims submitted to Medicare for the reimbursement of DME, providers were required to set forth, among other information, the beneficiary's name and unique Medicare identification number, the equipment provided to the beneficiary, the date the equipment was provided, the cost of the equipment, and the name and provider number of the provider who prescribed or ordered the equipment.

15. Medicare paid claims for the provision of DME only if the equipment was ordered by a licensed provider, was reasonable and medically necessary for the treatment of a diagnosed

and covered illness or injury, and was provided to a beneficiary. When seeking reimbursement from Medicare, providers submitted, among other things, the appropriate "procedure code," as set forth in the Current Procedural Terminology Manual or the Healthcare Common Procedure Coding System ("HCPCS").

16. For certain types of orthotics, such as knee braces billed under HCPCS code L1833, Medicare Local Coverage Determinations ("LCDs") required that a provider conduct an in-person examination of a beneficiary and document that examination in the beneficiary's medical record. According to the LCDs, knee braces ordered without a documented in-person examination were not medically necessary and not appropriately reimbursable.

*Genetic Testing*

17. Genetic testing for hereditary cancer used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future. Pharmacogenetic testing used DNA sequencing to assess how well a patient would likely respond to a specific drug therapy based on the patient's genes. Genetic tests that could predict future risks of cardiac conditions and disease, such as Parkinson's and Alzheimer's, were also available. All such tests were generally referred to as "genetic testing." Genetic testing was not a method of diagnosing whether an individual had a disease, such as cancer, at the time.

18. Medicare did not cover diagnostic testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A). Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury." 42 C.F.R. § 411.15(a)(1). In other words, Medicare

generally did not cover tests used for screening purposes. Although there were statutory exceptions that permitted Medicare coverage of certain cancer screening tests such as "screening mammography, colorectal cancer screening tests, screening pelvic exams, [and] prostate cancer screening tests," these statutory exemptions did not include genetic testing.

19. Because genetic testing did not fall within the statutory exceptions pertaining to certain screening tests, Medicare only covered such genetic testing in limited circumstances. For example, for cancer genetic testing, Medicare's coverage was generally limited to when a beneficiary had cancer and the beneficiary's treating physician deemed such testing necessary for the beneficiary's treatment of that cancer. Medicare did not cover cancer genetic testing for beneficiaries who did not have cancer or lacked symptoms of cancer.

20. Even when Medicare allowed for reimbursement of diagnostic testing, Medicare imposed additional requirements before covering the testing. 42 C.F.R. § 410.32(a) provided that "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem. Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary."

*Telemedicine*

21. Telemedicine provided a means of connecting patients to doctors by using telecommunications technology, such as the internet or telephone, to interact with a patient.

22. Legitimate telemedicine companies provided telemedicine or telehealth services to individuals by hiring doctors and other health care providers. Legitimate telemedicine companies

typically paid doctors a fee to conduct consultations with patients. To generate revenue, legitimate telemedicine companies typically either billed insurance for the consultation, like an office visit, or received payment from patients who utilized the services of the telemedicine company. By contrast, in telemedicine fraud schemes, the telemedicine companies paid a health care provider based on the number of orders a medical provider reviewed, and typically the telemedicine company neither billed insurance for office visits nor collected fees from beneficiaries because no legitimate consultation occurred.

23. Medicare covered expenses for specified telehealth services if certain requirements were met. During much of the relevant period, these requirements included that (a) the beneficiary was located in a rural or heath professional shortage area; (b) services were delivered via an interactive audio and video telecommunications system; and (c) the beneficiary was in a practitioner's office or a specified medical facility—not at a beneficiary's home—during the telehealth service with a remote practitioner. *See* 42 C.F.R. § 410.78(b). During the COVID-19 pandemic, Medicare still required live video or audio communication (depending on the service being provided) between the practitioner and the beneficiary.

Overview

24. From in or about February 2020 continuing through in or about June 2020, GRINSHTEYN knowingly and willfully made and used materially false representations, writings, and documents, knowing the same to contain materially false, fictitious, or fraudulent statements and entries in connection with the delivery of or payment for health care benefits, items, and services, namely DME and genetic testing for Medicare beneficiaries. GRINSHTEYN signed medical documentation, including orders (collectively, "doctors' orders"), for DME and genetic

testing for Medicare beneficiaries that made it appear that GRINSHTEYN was providing legitimate consultations to these beneficiaries, exercising his medical judgment in approving doctors' orders, and approving the orders consistent with medical standards.

25.     In fact, the doctors' orders were based on false documentation and not GRINSHTEYN's medical decision making. Medicare would have denied these claims had it known, for example, that the doctors' orders contained falsehoods, that GRINSHTEYN signed many of the doctors' orders without reading them, or that the claims were not the result of a legitimate consultation between GRINSHTEYN and each beneficiary.

26.     GRINSHTEYN obtained the doctors' orders from Conclave.

27.     GRINSHTEYN signed or caused doctor's orders to be signed (a) even though he did not see, speak to, or otherwise communicate with or examine the Medicare beneficiaries; (b) without regard to whether the beneficiaries needed the DME or genetic testing; (c) often without reading the doctors' orders; and/or (d) that falsely certified or represented that he had consulted with beneficiaries, conducted examinations prior to signing the doctors' orders, obtained consent, and/or would use the genetic testing results to treat the beneficiaries. In signing orders under these circumstances, GRINSHTEYN falsified material facts and made false representations or used materially false writings or documents knowing they contained materially false statements that in connection with DME and genetic testing.

28.     On or about May 7, 2020, GRINSHTEYN signed a doctor's order for genetic testing for Medicare Beneficiary 1 for which Medicare was billed approximately $7,454.24. On or about June 24, 2020, Medicare paid approximately $7,454.24 for the claim resulting from this order. The doctor's order falsely stated, among other things, that GRINSHSTEYN had: (i) "an on-

going relationship with the patient;" (ii) that he would "use the results in the management of the patient's medical condition;" and (iii) that he would "follow up with the patient once the test results are received to render additional treatment decisions based on the test results."

29. Over the relevant period, GRINSHTEYN caused DME suppliers and laboratories to submit approximately $5.9 million in claims to Medicare based on doctors' orders containing materially false representations, for which Medicare paid approximately $3.1 million, including the claims underlying Count One.

## COUNT ONE
### False Statements Relating to Health Care Matters
(18 U.S.C. § 1035(a)(2))

The United States Attorney charges:

30. The United States re-alleges and incorporates by reference paragraphs 1-29 of this Information.

31. On or about the date specified below, in the District of Massachusetts and elsewhere, the defendant,

### SIMON GRINSHTEYN,

in a matter involving a health care benefit program, specifically Medicare, as defined in 18 U.S.C. § 24(b), did knowingly and willfully make materially false, fictitious, or fraudulent statements and representations, and make and use materially false writings and documents, knowing the same to contain materially false, fictitious, or fraudulent statements and entries, in connection with the delivery of and payment for health care benefits, items, and services, that is, GRINSHTEYN submitted orders for genetic testing, stating the genetic testing would assist GRINSHTEYN in medical decision making and/or medical management, when in fact GRINSHTEYN had no contact with the beneficiary and did not intend to and did not provide medical treatment to the beneficiary based on the genetic testing that he ordered:

| Count | Approx. Date | Approx. Claim Paid Date | Medicare Beneficiary | Record Containing False Statements and/or Concealment of Material Facts |
|---|---|---|---|---|
| 1 | 5/7/2020 | 6/24/2020 | Beneficiary 1 | Written order for genetic testing |

In violation of Title 18, United States Code, Section 1035(a)(2).

## FORFEITURE ALLEGATION
(18 U.S.C. § 982(a)(7))

The United States Attorney further alleges:

32. Upon conviction of the offense in violation of Title 18, United States Code, Section 1035, set forth in Count One, the defendant,

SIMON GRINSHTEYN,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense. The property to be forfeited includes, but is not limited to, the following asset:

   a. $32,190 United States currency, to be entered in the form of a forfeiture money judgment.

33. If any of the property described in Paragraph 32, above, as being forfeitable pursuant to Title 18, United States Code, Section 982(a)(7), as a result of any act or omission of the defendant—

   a. cannot be located upon the exercise of due diligence;
   b. has been transferred or sold to, or deposited with, a third party;
   c. has been placed beyond the jurisdiction of the Court;
   d. has been substantially diminished in value; or
   e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 982(b), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 32 above.

All pursuant to Title 18, United States Code, Section 982(a)(7).

                                            LEAH B. FOLEY
                                            United States Attorney

                            By: _____
                                   ALEXANDRA BRAZIER
                                   LINDSEY ROSS
                                   Assistant U.S. Attorneys

Date: January 22, 2026